Comstock, Ch. J.
The testator, after directing his executors to pay his debts and funeral expenses out of any personal estate which might come to their hands, proceeded in the second clause of his will to devise and bequeath to his son John Stanton Marshall, his dwelling-house and lot on Congress street in Troy, together with his plate, household furniture and wearing apparel .during the son’s natural life, “ and in case he shall die leaving issue, the same shall go to his heirs.” In the third clause he bequeathed the Walcott bond and mortgage, ,a security amounting to nearly $150,000, as follows: one-third part to his executors., upon trust to keep the same invested and apply the annual income to the support of the said John Stanton Marshall during life, and if he should die leaving lawful issue, then to pay the principal to such issue; one-third part to the children of the testator’s brother James Marshall, in equal shares, and one-third part to the children of his brother Jeremiah Marshall; and in case any of the said children should die leaving issue, the share of the one so dying was to go to such issue. In the seventh clause it was declared, that if the said John Stanton Marshall should die without lawful issue, “ all the real and personal estate above devised and bequeathed to him ” was to, go to the children of the said brothers James and Jeremiah, “ to be divided and distributed amongst them in the same manner and proportions as directed in the bequest to them in article third above written.” The only .devise or bequest to the son John Stanton Marshall, is contained in the *369 said second and third clauses, and consequently this contingent limitation in favor of nephews and nieces refers to those clauses only.
The first questions arise upon these provisions of the will. John Stanton Marshall, the son, having died without issue in •the lifetime of the testator, it is claimed on the part of the benevolent institutions, that the limitation over in favor of the children of James and Jeremiah, embracing the real and personal property mentioned in the second clause, failed with the primary gift to him and his issue in that clause contained. These institutions being provided for in the residuary clauses to be hereafter considered, they farther claim that the property, both real and personal, which is the subject of the primary gift and of the limitation over, sinks into the residuum, instead of descending to the heirs or passing to the next of kin, as undisposed of. In the judgment appealed from, it is determined that a lapse was occasioned by the. death of the son without issue; that consequently the devise and bequest over did not take effect; that so much of the property here spoken of, as was personal, passed under the residuary clauses and that the real estate, being the residence on Congress street, descended equally to the two heirs-at-law, James E. Marshall and John W. Downing. These consequences might follow if it were true that the substituted devise and bequest to the children of James and Jeremiah were intended to take effect only in the event of John Stanton Marshall dying without issue after the death of the testator. But we see no reason for imputing such an intention, nor are we aware-of any rule which requires such a construction. The substitution was to operate in the single event named, the death of the Son without issue. The son and his issue were the primary objects of the testator’s regard in these provisions of the will. If his bounty could not take that direction, he designed it for the children of the two brothers. Such being the general purpose, it was perfectly indifferent to him whether the ulterior limitation should take effect immediately on his own decease or at some indefinite time afterwards. He therefore declared, in plain words, that *370 the brothers’ children should have this property if his own son should die without issue, and he did not qualify that contingency by still .another which might prove, and in fact would prove; fatal to his main purpose. ■ There is no ground for supposing that his wishes, in regard to the ultimate disposition of the property, depended in the slightest degree on the time when the son should die without issue. Whenever that event should occur, the other objects of his bounty were substituted. If the doctrine of lapse had been more attentively examined, it would have been seen that it has nothing to do with the question. Testamentary gifts are liable to failure in consequence of the ambulatory nature of wills which cannot take effect in favor of persons who die before the testator, because until then such instruments can have no effect at all. The principle of the lapse is the same as that which defeats the operation of a deed in favor of a person who is dead at the time of its execution. And whether the instrument be a will or a deed, if the ancestor be dead, the heir cannot take in succession to him. This rule has been changed by our statute in the case where the devise or bequest is to a child or descendant of the testator, who dies in his lifetime, leaving a descendant who survives the testator. In such a case the estate or interest given vests in the descendant of the legatee or devisee. (2 R. S., p. 66, § 52.) But the principle which, at the common law occasioned, and still may occasion, the lapse of a legacy or devise, can have no application to substituted gifts. The primary gift may lapse or fail if its object dies before the will can operate at all, but this has no tendency to defeat an-independent and ulterior limitation to other objects who are living at the testator’s death. In such cases the question is not one of lapse, but of interpretation and intention in regard to which, in the case before us, we think there is no room for doubt. (1 Jarm. on Wills, 293; Norris v. Beyea, 3 Kern., 273.) We are of opinion, therefore, that on the death of the testator, the dwelling-house, plate, furniture, &c., mentioned in the second clause of the will, vested according to the seventh clause in the children of the brothers, James arid Jeremiah, *371 then living. The modification of this result, as to the real estate, by reason of the alienage of all those children, except one, will be presently noticed.
Upon the same grounds a like conclusion must be adopted in regard to the one-third part of the Walcott mortgage, the income of which, according to the third clause, was to be applied to the support of the said John Stanton Marshall during his life, and the principal of which was to be paid to his issue, if he should leave any, provided the substituted limitation in favor of the brothers’ children was intended to embrace this fund also. The subject of that limitation, as we have seen, was described as “ the real and personal estate above devised and bequeathed to ” the testator’s son. The benevolent institutions and societies, as residuary legatees, insist .that this description does not include the said one-third part of the Walton mortgage. But we think otherwise. ¡Nothing but a life interest was given to the son in any of the property in question, whether mentioned in the second or third clauses. This is expressly so declared in both those clauses. If he died-leaving issue, such issue were to take, not as his representatives, but directly from the testator as his devisees or legatees. It is manifest, therefore, that “the real and personal estate above devised and bequeathed," according to the descriptive words of the seventh clause, is the real and personal estate in which a life interest only was devised and bequeathed to the son; and the description thus understood is quite as applicable to the one-third of the Walcott mortgage mentioned in the third clause, as to-the dwelling-house, plate, &c., mentioned in the second; unless indeed it be a distinguishing circumstance that the gift of the mortgage fund is in terms to the executors upon trust. But we think this is not a material circumstance. The gift was beneficially to the son, and, notwithstanding the trust it constituted, in the view of the testator, the son’s estate, and he described it in that manner in the ulterior limitation. In another clause of the will (the 8th), there is an undoubted reference to this mortgage under the descriptive words “ the income of my said son’s estate." Here we find the one-third *372 part of the mortgage spoken of as the estate of the son. The testator’s language was not accurate, but we entertain no doubt that he intended to give the principal of this fund to the children of the brothers on the death of his son without issue. This conclusion does not seem to have been questioned in the court below; but, as already mentioned, on the ground of lapse, the fund was adjudged to belong to the residuary legatees. That there was no lapse, has been already shown.
There were at the death of the testator eight children of James Marshall, all of whom were aliens, except James E. The children of Jeremiah Marshall were six in number, and all of them aliens. The only kindred of the testator capable of inheriting real estate were the said James E. Marshall and John W. Downing, the son of a deceased sister. It follows, that of the two classes of children who were the objects of the devise and bequest in the seventh clause, only James E. Marshall could take by devise, and that the Congress street .house and lot, except the interest to which that clause entitled him, either descended to him and Downing equally as heirs-at-law, or else passed under the residuary clauses of the will. The question next to be considered is whether James E. Marshall took by the devise only one-eighth of one-half, or one-half, being the whole interest which the devise by its terms gave to the class of children to which he belonged. According to the decision made at the original hearing of the case he'took under the will, only the smaller or fractional part. On the appeal in the Supreme Court it was held, erroneously as we have seen, that the whole devise had lapsed.
I come to the conclusion with some hesitation that James E-Marshall took under the devise one-half of this real estate. The limitation in its terms is to the children of the brothers James and Jeremiah, “ to be divided and distributed amongst them in the same manner and proportions as directed of the bequest to them in article third above written.” In the third article, as we have seen, there is a direct bequest of one-third of the Walcott mortgage to the children of James in equal shares, and a like gift of another third to the children of Jere *373 miali. These are the bequests referred to in seventh clause as regulating the proportions in which the contingent devise and bequest of the house and other property was to vest in the two classes of children. Each class was therefore to take one-half, and the equality of the shares refers necessarily only to the divisions of interest amongst those embraced in either class. But of the children of James, one and one only could take according to the statute, which declares a devise to aliens void. Upon the point whether he is entitled to take all that was intended for him and his brothers and sisters, we have no key to the intention of the testator, because the testator assumed that all were equally competent, and he framed the devise accordingly. We must therefore ascertain, if possible, the rule of law to be applied to such a case.
Where a devise or bequest to two or more persons by name is in such form as to create a joint tenancy, and one of them dies before the testator, it is well settled, that the whole interest vests in the survivors; and this result will take place if the gift fails, as to one of the persons from any other cause than death. (1 Jarm., 295; Amb., 136; 3 Bos. & Pul., 16.) It is equally clear that when the limitation creates a tenancy in common, the gift being to several persons by name and not to them as a class, the same consequence will not follow from the death of one of them. In such a case, the share of the one dying before the testator, or before the time when it is to vest, is lapsed. In the present case, all the children of the brothers living at the death of the testator, and competent to take, would undoubtedly take as tenants in common. When an equality or inequality of shares is prescribed in express words, the language was always held to create such a relation. But the devise was not to the children by name but to them as a class, and in such a case, although a tenancy in common may result, the same consequence does not follow as to the share of one of the class who has died, or for some other reason cannot take. Mr. Jarman says, “ where the devise or bequest embraces a fluctuating class of persons, who by the rules of construction are to be ascertained at the death of the testator, or *374 at a subsequent period, the decease of any of such persons during the testator’s life will occasion no hiatus or lapse in the disposition, even though the devisees or legatees are made tenants in common, since members of the class antecedently dying are not actual objects of the gift.” “ Thus,” he adds, “ if property be given simply to the children or to the brothers and sisters of A, equally to be divided between them, the entire subject of gift will vest in any one child, brother or sister, or any larger number of these objects surviving the testator, without regard to previous deaths.” (1 Jarm., 295, 296.) In Doe v. Sheffield (13 East., 526), there was a devise of land to the “ sisters ” of J. H., expressly, as tenants in common, and to their heirs and assigns forever. There had been three sisters of J. H., but only one was living at the death of the testator, or at the date of the will. It was held that she was entitled to the whole. So in Viner v. Francis, (2 Bro. C. C., 658,) a legacy of £2,000, was given in equal shares to the “children” of a deceased sister of the testator, of whom there were three at the date of the will, but one died in his lifetime. It was held, that the two survivors were entitled to the whole sum. (See, also, 3 Hare, 348.) I do not find in the books the exact case where the gift was to a class of persons as tenants in common, some of whom were incapable of taking by reason of alienage. But such a case falls within the principle of those referred to. Whether the impossibility of taking is a natural one arising from the death of one or more of the devisees, or whether it flows from a legal incapacity, the result appears to me the same. In the example before us, the. testator contemplated the objects of his bounty as a class, and not as individuals. The gift was to vest whenever his son should die without issue, and in fact it vested as soon as the will took effect by the decease of the testator himself, the contingent event having previously occurred. We think that James E. Marshall then became entitled to the one-half of the real estate in question, as the only competent representative of the class to which it was devised.
*375 AE the children of Jeremiah Marshall being aliens, none of them were competent to take the other half of the house and lot under the devise to them. On behalf of the MarshaE Infirmary and the religious societies, it is claimed that this interest passed under the residuary clauses of the wiE. But we think otherwise. The statute declares that real estate so devised “shall descend to the heirs of the testator; if there be no heirs competent to take, it shall pass under his wEl to the residuary devisees therein named, if any there be, competent to take such interest.” (2 R. S., 57, p. § 4.) This statute plainly leaves no room for a distinction in this respect between a void and a lapsed devise. According to some authorities, if the disposition was 'originaEy invalid, the residuary devisee takes the estate in opposition to the rule which prevails in case of a lapse. I think the distinction was never well founded. It was rejected by the Court of Errors of this State, after the most elaborate consideration, in the case of Van Kleek v. The Dutch Church (20 Wend., 457), where the devise was assumed to be void, because made to a corporation. If void by reason of the alienage of the specific devisee, the statute, in plain terms, seems to repel any such distinction. One-half of the real estate now in question therefore descended to the heirs, and the result is, that on the death of the testator, James E. Marshall became entitled to three-fourths of the whole (one-half by devise, and one-fourth by descent), and John W. Downing to the remaining one-fourth.
The most important questions in this case arise upon the residuary dispositions of the wiE. In the fourth clause, the testator devised and bequeathed to his executor “ all the rest and residue of his real and personal estate whatsoever and wheresoever situated,” upon the trusts declared in the fifth and sixth articles. By the fifth article, he directed the executors to continue in operation the manufacturing establishments called the “ Ida Mills,” in Troy, in such manner as they should deem best, during the natural lives of Joseph MarshaE Coville, of New York city, and Joseph Marshall, of North Adams, Massachusetts, and of the survivor of them, or so long within *376 their lives as, in the opinion of a majority of said executors, the same could be done without material injury to the interests of the estate, and of those participating in the income thereof, and to distribute and appropriate the net annual income or profits thereof and also the net annual income of all other real and personal estate not otherwise disposed of by the will, as follows: One-half in equal shares to the American Bible Society, the American Tract Society and the American Home Missionary Society, and the other half to be expended in supporting and maintaining the Marshall Infirmary in the city of Troy, for the support of poor and indigent, sick and lame persons. In the sixth clause, the executors were directed, on the death of the said Joseph Marshall Ooville and Joseph Marshall, to convert into money or otherwise dispose of the real and personal estate so devised and bequeathed to them in trust, and to distribute and deliver over such moneys or estate to the several legatees for the objects named in the fifth clause, and in the same proportions as therein directed in respect to income. The property embraced in these clauses "of the will was principally the Ida Mills.
I am clearly of opinion that a trust to receive the rents and profits of real estate, and apply them to the use of the beneficiaries named, was marked out in these provisions. The mills were to be carried on by the executors, to whom, as trustees, the legal estate was expressly devised. It is true that the annual income of the business would be a complex result flowing from the use of the water-power, the machinery and the mills; from the profit of capital, and the employment of labor. The material consideration is, that the use or profit of land would be one of the constituents in producing that result; and it might be the principal one. The executors were to have the possession of these establishments, and to operate them for the benefit of the institutions or societies which were the objects of the testator’s benevolence. In this manner the profit of land was to be received, and, in combination with other elements, it was to be paid over to the beneficiaries. In a trust to receive the rents and profits of real estate, it is not implied that the trustee must *377 lease the estate, because that is not the only or the most usual mode of perception. As the owner of land may lease or occupy it, so, in creating a trust, he may provide for receiving the use or income in either of these modes.
But, although trusts to receive and apply rents and profits may be created under the statute of uses and trusts, the one in question is not constituted in the manner which that statute prescribes. The application of rents and profits must be “to the use of any person during the life of such person, or for any shorter term.” (1 R. S., p. 728, § 55, sub. 3.) The trust must, therefore, be made dependent on the life of the beneficiary. In this case the beneficiaries are associations, incorporated or unincorporated; while the lives on which the trust depends are those of two natural persons having no interest in its performance. Such a limitation is plainly unsupported by any construction which we can give to the language of the statute.
We are next to inquire, whether, in the law of trusts and powers, there is any other mode of giving effect to the testator’s intention. The law on this subject underwent a considerable change in our revision of 1830. But there has been, I think, some misapprehension as to the character and extent of that change. All express trusts were abolished, except certain ones enumerated in the fifty-fifth section of the statute, which were, 1st, to sell lands for the benefit of creditors; 2d, to sell, mortgage or lease lands for the benefit of legatees, &c.; 3d, to receive the rents and profits of land and apply them, &c.; 4th, to receive the rents and profits of lands and accumulate the same, &c. (1 R. S., p. 728.) The impression has prevailed to some extent that these provisions of law have taken from owners the power of impressing upon their estates any limitations having the general characteristics of a trust, except such as are thus enumerated.
That this impression is not well founded will appear on a brief consideration of the subject. At the common law, fiduciary interests in land under the name of uses might be created without any restriction depending on the object or purpose of the trust. Limitations of this character were enforced upon *378 the conscience of him who held the legal estate. Prior to the statute of uses (27 Hen. VIII), these limitations were, perhaps, only known in their simplest and_ most elementary form, that is to say, in the form of legal estates held by one person for the benefit of another, without any active duty or trust. In this form they were abrogated by that statute. This was done, not by defeating the feoffment or devise, to such a use, but by vesting the legal estate in the beneficiary. After the statute, uses were revived under the name of trusts. By a strict construction of that enactment, passive trusts might still be created by limiting a use upon a use; it being held that the statute only executed the use in the first cestui use, who was allowed to hold the estate for the benefit of the second. This was doubtless an evasion of the letter and policy of the statute; but neither its letter nor policy stood in the way of creating active trusts, that is, legal estates, impressed with some active duty in their control, management or disposition for the benefit of some person or class of persons other than'the trustee. Trusts of this kind grew up and expanded to meet the wants and wishes of mankind. They were undefined by any statute or rule. The reason, .or occasion, for vesting the legal title in a trustee, appears to have_ rested in the discretion of the author of the trust, Where the instrument did not in terms so vest the title, there was always a question whether the nature of the trust, or duty declared, was such as to render the presence also of the legal estate necessary or convenient. If so, the title was deemed to vest in the trustee accordingly. If not, then it remained in the donor, or his heirs, subject to the trust as a power. Powers were no less undefined than trusts. The intention as to the legal estate being unexpressed, powers began where trusts terminated. But, to ascertain the dividing line between them was often attended with difficulty, and perplexing questions frequently arose. (Brewster v. Striker, 2 Comst., 19.)
Such was the state of the law at the time of our revision of 1830. We had enacted the English statute of uses at an early day, but had made no other change in jurisprudence on this subject. The system of trusts was a complicated one, and was *379 believed to be attended with great inconveniences. These it was proposed to remedy, not by depriving men of the power of disposing of their estates, nor even by abridging that power, but by giving effect to such dispositions according to a more simple classification so as to relieve this branch of the law from much useless refinement and perplexity. Trust estates of a character purely passive, which might exist in various forms, notwithstanding the statute of uses, were justly considered wholly unnecessary. These were accordingly abrogated: but this was not done by defeating such limitations entirely. On the contrary, the policy of the former statute was enlarged by new and appropriate provisions which vested the title in the beneficiary. (1 R. S., p. 727, §§ 47, 49.) The utility of active trusts was not questioned. But these were believed to be capable of great abridgment, and of a precise and'accurate definition; and they were defined in the 55th section above mentioned. All other express trusts were abolished (§ 45) by which the Revisers and the legislature intended simply that legal estates impressed with trust duties and powers should be created only in the cases specified. The provisions of the statute were aimed against the attempt to create Such estates or titles, but not against the duty, trust or power. This is perfectly manifest from the provision which declares that if an express trust be created for any purpose not enumerated, no estate vests in the trustee, but if the trust authorizes the performance of any act lawful under a power, it shall be valid as a power in trust. (§ 58.) There was, very wisely, no attempt to enumerate or define the acts which might be lawfully done under a power, and in that respect, therefore, the law was subjected to no innovation. The result is, that express trusts, using that term in the strict technical sense as descriptive of legal titles, vested in a trustee for the fiduciary purposes declared in the instrument, were abridged and confined to the enumerated classes. But the trust limitation, although not belonging to that class, if not otherwise unlawful, will be effectuated in a different mode. If of a passive charatiter, the use is executed by vesting the title in the beneficiary *380 If active, it takes effect as a power in trust, leaving the title in the donor or his heirs, subject to the power. And thus, as the old statute of uses which was intended to abolish passive trusts, left the widest field for the creation of active ones, so our revision, in abrogating all active trusts, except the few particularly specified, has reanimated them under the name of powers which are left without restriction, provided the purpose of the limitation or power be in itself a lawful one. The statute, it is true, enunciates a code on the subject of powers also, but it makes no attempt to enumerate or define the lawful occasion for creating a power.
Referring now to the residuary devise in question, we have seen that it does not belong to the class of active trusts permitted by the statute. It is also clear that the statute does not execute the uses intended by vesting the legal-title in the beneficiaries. This is clear because the trusts impressed by the will upon the estate devised to the executors are of the most active description, requiring them to take the possession and management of the property into their own hands. The limitation must, therefore, take effect as a power in trustor be defeated altogether. To giving that effect to it there is no objection if the beneficiaries are competent to take, and if the acts prescribed to be done are lawful in themselves. It needs no argument to prove that it is lawful for the owner of land to devote the rents and profits to the use of any beneficiary, under no incapacity to receive them by any instrument to take effect during his life, or by his last .will, provided the limitation does not violate the rule as to'the alienability of estates. It is equally clear in this case that nothing more than a power was vitally necessary to carry on the testator’s manufacturing establishments, and to apply the net income in the manner he prescribed. That the presence of the legal title would be highly convenient for these purposes' may be admitted; and it may also be admitted .that the Revisers committed a grave error in attempting to define all the proper occasions for creating a trust estate. The rule against perpetuities was not violated by this devise; because it did not attempt to suspend the power of alienation beyond two lives *381 in being, at the death of the testator. (1 R. S., p. 723, §§ 14, 15.) It is plain, also, that the Ultimate trust to sell and distribute the proceeds contemplated an act lawful in itself, but which did not require the presence of the legal estate in the trustees.
It follows from these views, that the residuary dispositions of this will failed to vest in the trustees the legal title of the real estate embraced in them: in other words failed to create a technical trust as the testator intended. But it also follows that those dispositions, were valid as powers in trust, so far as we have yet examined the question. The difficulties which remain to be considered arise out of the alleged incapacity of the beneficiaries in whose favor it was intended to create the trust. The American Home Missionary Society was an unincorporated association having a regular organization, its object • being the spread of the Gospel in this country. Thp American Bible Society was incorporated by act of the legislature in the year 1841, for the purpose of promoting the circulation of the Holy Scriptures. The second section of the charter declares that'the net income of the society arising from its real estates, shall not exceed the sum of $5,000 annually. The third section declares that the corporation shall possess the general powers, and be subject to the provisions of the third title of chapter eighteen, part first of the Revised Statutes, so far as the same are applicable and have not been repealed. (Laws of 1841, p. 41.) The American Tract Society was incorporated in the same year, The income of its real estate was restricted to $10,000, and the charter contains a like reference to the Revised Statutes. (Stat., p. 249.) In those Statutes the general powers of all corporations are defined, and among them is the one “ to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require; not exceeding the amount limited in its charter. (1 R. S., p. 599, § 1, sub. 4.) In regard to these two societies it is not claimed that the devise now in question, if upheld, will carry their real estate or the income therefrom to .an amount exceeding the limits prescribed in their respective charters. The Marshall Infirmary was incorporated in the year 1851, and was declared “ capable of taking by direct purchase *382 or otherwise, holding, conveying, or otherwise disposing of any real or personal estate ” for the purposes of the corporation, so that the net annualincomeshould not at any time exceed $20,000. (Laws of 1851, p. 537.) It is conceded that the provision made by this testator will not carry the amount beyond the prescribed sum. The claims of these beneficiaries are now to be considered with reference to the character and capacity of each.
And, first, we think that the residuary devise and bequest were void as to the unincorporated Home Missionary Society. That society is composed of a fluctuating and unascertained class of persons, having no legal capacity to take the gift. The beneficiaries are the entire community within the influence of the society. There is no trustee competent to take the fund so as to secure its appropriation to the benevolent purpose intended.. That such a gift is void according to legal rules, it needs no argument to prove. There is no trustee, and there are no beneficiaries ascertained, either as individuals or as a class of persons. These objections are fatal. It is said that a trust shall never fail for want of a trustee, because a court of equity will supply the defect. But this is true only of a valid trust, and in order to be valid, it must be so constituted that a title can vest in some person, natural or artificial, by force of the gift itself. The principles on which this question depends have heretofore been fully examined by this court. A charitable donation, precise and definite in its purpose, void at law because the beneficiaries are unascertained, may be maintained if there be a competent trustee to take the fund and effectuate the charity. If there be no such trustee it fails, and the heir or next of kin is entitled. (Williams v. Williams, 4 Seld., 525; Owens v. The Missionary Society, 4 Kern., 380; Beekman v. Bonsor, ante, 298.) It is true in the present case, that according to the dispositions made by the testator the executors were appointed the devisees and legatees ,in trust; but they were not constituted trustees of the charity. The' objects of the charity were mankind in general, or that portion of mankind within the sphere of the missionary labor carried on by the society. It had no trustees except the unincorporated persons *383 forming the society itself. The duty of the executors would be fully performed by paying over the income, and ultimately the principal, of the fund to any agent óf those persons. Those persons were a fluctuating body unknown to the law, irresponsible to the courts, and incapable of receiving a gift even for a purpose which the law may denominate charitable.
The claims of the Bible and Tract Societies may be considered together, because they are each incorporated with, powers entirely similar. Their charters, by limiting the amount of income to be derived from real estate, imply that real estate may be taken and held by them, but being silent as to the mode of acquisition, the general statute in regard to corporations, which has been mentioned, must be referred to as the source of power in this respect. By the terms of that statute, as we have seen, corporations are authorized “ to hold, purchase and convey ” real and personal estate not exceeding, &c. This statute, by itself, contains no prohibition in respect to the manner of* acquiring the real estate which corporations may hold, while, on the other hand, it confers no express .authority to take by devise. But the same legislature which enacted this statute also enacted the existing statute of wills, by which it is declared that “ no devise to a corporation shall be valid unless such corporation be expressly authorized by its charter, or by statute, to take by devise.” (2 R. S., p. 57, § 3.) Effect must be given to both these enactments, and the conclusion is plain that the general authority which all corporations possess to take and hold real estate does not include power or capacity to take by will. Indeed, the English statute of wills passed in the reign of Henry VIII, which was an enabling act and was reenacted at an early day in this State, contained an exception of bodies politic and corporate. It requires no further argument to show that these two societies could not acquire real estate in this manner.
The question remains, however, whether the residuary clauses of the will, so far as intended to benefit these two corporations, were so flamed as to fall within the prohibition against devising to such bodies. As we have seen, the intern *384 tion of the testator was to create a trust under which these societies were to share in the profits and income of real estate during two lives, and then the same réal estate was to be converted into money and they were to share in the distribution. By a legal necessity, hs we have also seen, the trust can be maintained only as a power. The inquiries now are, 1, whether the statute of wills prohibits these two corporations from sharing in the use and profit of the land during the two lives mentioned in the devise; and 2, whether they will be entitled to share in the proceeds of the land when the time shall arrive for converting it into money as the will directs.
In the case of McCartee v. The Orphan Asylum Society (9 Cow., 437), it was held by Chancellor Jones that a devise of real estate to executors in trust for a charitable corporation was valid, notwithstanding the exception in the statute of wills then in force. This conclusion was maintained in an opinion of great learning, but much too extended to admit of a-particular review. The general course of reasoning was, however, as follows: The English statutes of mortmain, in force from an early period in the history of that country, prohibited the acquisition of land by corporations, and this prohibition was extended to uses by a statute passed in the reign of Bichard II Prior to that time the ecclesiastics had evaded the mortmain acts by procuring lands to be conveyed to natural persons for the use of religious houses or bodies, and the clerical chancellors had enforced the use. The statute of 15 Richard II, (ch. 5) was enacted to "prevent this evasion. According to the principles of feudal law, lands could not be devised at all; but as uses were considered separate from the land upon which they were impressed, a person entitled to a use could, before the statute of Bichard II, devise it to an individual or a corporation. The statute of wills (34 Hen. VIII, ch. 5) contained an exception as to bodies politic and corporate; but this exception was to prevent an implied repeal of the mortmain acts. Without that exception, the general power of devising would include devises to corporations. In this State all the mortmain acts were repealed, and the statute of wills was reenacted with *385 the same exception. But the exception was not, with us, as in England, auxiliary to a mortmain system of law and policy. Our statute of wills, therefore, simply failed to confer on devisors a capacity of devising to a. corporation; and it was consistent with legal principles to overcome that difficulty by allowing corporations to take "from a third person to whom lands might be devised in trust All the statutes of mortmain, including those which related to uses, being repealed, a use could be devised, as at the common law, without the enabling statute of wills. That statute was only required to render legal estates devisable; and the exception, therefore, only applied to such estates. It created merely a technical difficulty, founded in no policy, which might- be obviated by any technical contrivance. Thus, a wife cannot convey to her husband, but she can to a third person, from whom the husband can receive the use or the title. So the owner of lands could not devise them to a corporation, but he could to a natural person in trust for a corporation. Even if these views were untenable, and a devise in trust should be held as embraced within the exception to our statute of wills, then the learned Chancellor thought that, where the trust was for a charity, it was maintainable notwithstanding that statute. I have given the substance of the reasoning by which the conclusion was maintained in few words, and in the best manner I am able.
The Court of Errors reversed the decree of the Chancellor, on the ground that the devise was direct to the corporation, and not in trust. It was a gift to a charity of the very highest merit, and the court of last resort therefore necessarily determined that the doctrine of charitable uses could not be invoked to maintain a gift to a corporation- void at law, because not permitted to be made by the statute of wills. On this point, decisions the other way can be found in England, founded- on the idea that the statute of charitable uses (43 Eliz.) created in favor of charities an exception to the mortmain acts, and modified the exception in the statute of wills. (4 Kent’s Com., 507, and note.) But the statute of 43 Elizabeth was never in force in this State, and it was, moreover, repealed at an early dav *386 It is plain, therefore, that a devise to a charitable. purpose cannot be sustained, if made to a corporation in violation of the statute of wills.
The decision of the Court of Errors left untouched the question whether a devise in trust for a corporation was valid. The views of Chancellor Jones on that point were neither affirmed nor disaffirmed. Without fully accepting them myself, I do not propose to criticise them. Very soon after the decision of the Chancellor in that case, the existing statute of wills was proposed and adopted in the legislature as part of the Revised Statutes of the State. The senate was the same body which ' participated in the determination of the case in the Court of Errors. In place of an exception which, as had been contended, simply withheld capacity to-devise in favor of a corporation, a broader enactment was substituted, intended to prohibit such devises. The statute was so framed as to declare that all persons, except idiots, &c., may devise their real estate: that every estate and interest descendible to heirs may be so devised: that such devise may be made to any person capable by law , of holding real estate; but it was added that “ no devise to a corporation shall be valid, unless such corporation be expressly authorized by its charter or by statute to take by devise.” In this form the statute was designed to be prohibitory, and to leave no room for the subtleties and refinements which had obscured the subject. The language is so broad as to include every interest which is capable of being devised. Uses and trusts, not less than legal estates,, fall under the prohibition. The enactment is, moreover, founded in a just policy, which ought to be faithfully maintained. It is said we have no mortmain policy or statutes. But this is not so. The exception in the former statute of wills was with us intended to prevent devises of real estate from being made to corporate bodies, where it would be locked up in perpetuity, and also to prevent languishing and dying persons from being imposed upon by false notions of duty prompting them to disregard the claims of family and kindred. The positive statute we now have is still more distinctly founded m that policy, and it was enacted to *387 solve the doubts which great learning and ingenuity had suggested. It is a statute of mortmain resting on a mortmain policy, as distinctly as any act of the British Parliament The condition of society and the freedom of religious opinion in this country have rendered the necessity of still greater restrictions on the power of acquiring real estate by corporations, less apparent than formerly in England. But the necessity is recognized of forbidding the acquisition by will, unless the legislature, in granting the charter, and in full view of the reasons for so doing, think proper to confer the power in express terms. The legislative grant of the power is -the equivalent to the license from the crown, which, according to an act of Parliament, might dispense with the mortmain statutes in Great Britain. Mor is this necessity by any means a fanciful one. It is eminently praiseworthy to give in the interests of charity and religion. But in the last hours of life exaggerated impressions of charitable or religious duty often obscure the judgments of men, and subject them to undue influence and persuasion. Against these the statute is intended to guard, because it is in behalf of associations incorporated for pious and benevolent purposes, that the sentiments of men in such situations are most, generally appealed to. The enactment is therefore prohibitory, and it ought to be expounded and applied in that sense. The learned Revisers, in reporting it to the. legislature, observed in the accompanying note, “ it has been put in the form of a positive prohibition with the view of calling the attention of the legislature to it, that it may be retained if it is intended to be prohibitory, or may be expunged if deemed unnecessary. It is a question now agitated' in our courts, whether it is to be considered as a prohibition or not.” The legislature adopted the section without alteration, and we are consequently left in no doubt as to its spirit and policy.
I entertain, therefore, a decided opinion that the residuary devise in question cannot be sustained for the benefit of the Bible and Tract Societies, so far as it relates to the use and profit of the land during the two specified lives. It can make no difference, that in consequence of the invalidity of the *388 trust, it could take effect only as a power, even if the beneficiaries were authorized to take by devise. The result of the disposition is the same, whether we call it a trust or.a power. In either mode of sustaining the devise, the rent and profit of land is the thing given, and as no interest in land can be lawfully devised to a corporation, the technical character of the limitation is immaterial. That which the law forbids to be done at all, cannot be accomplished by a merely formal change in the mode of arriving at the result.
Upon the question whether the ultimate direction to sell the real estate in question and pay over-the proceeds at the expiration of the two lives mentioned, is valid as to the Tract and Bible Societies, the views of the court will be expressed by Judge Dentó. This point has appeared to me involved in some doubt, but I do not dissent from his conclusion, which is in favor of the validity of that direction.
We are next to determine the rights of the Marshall Infirmary. That institution, we think,- is expressly authorized by its charter to take by devise. As we have seen, the power given is to take “by direct purchase or otherwiseThe word purchase must be taken to have been used in its popular sense, and not to include acquisition by will. This was held in the case of McCartee v. The Orphan Asylum, where the authority was, to take by purchase merely. In this sense the term is used in the general statute before cited, defining the powers of corporations, and in all special charters granted by the legislature, where it is not intended to confer the power of taking by will. But in the charter of the institution now in question, an additional term was used broad enough to include every mode of acquiring real estate. According to the statute of wills, the authority to take by devise must be express. But this only means that corporations, as such, cannot take in that manner, as they can by purchase, for the purposes of their organization. In giving express authority to take and hold by devise, that term is not necessary to be used. In all language that is expressed which the words, fairly interpreted, mean. When the legislature, in granting this charter, said *389 that real estate might be acquired by purchase or otherwise, I see no reason to doubt that all the modes known to the law were intended. If we hold this not to be so, then we must say that the additional word, inserted apparently with care and contrary to the general course of legislation, is destitute of all meaning. The charter would exclude even capacity to take by gift, whether made by will or deed; because “purchase,” in the popular sense, implies an exchange for value. It is not to be supposed that the legislature would charter such an institution with such a restriction. The testator himself appears to have been the founder of this charity. It was undoubtedly the cherished object of his care. Its purposes are, in the highest degree, meritorious; and I am unwilling to place upon its powers a technical and narrow construction which the language of its charter does not demand, and which would entirely defeat the liberal endowment he designed for it.
Other questions of minor importance were suggested on the argument. One of these relates to the compensation of the executors, it being supposed that some part of the duties assigned to them, respectively, has been abrogated by the failure of material portions of the will. Another relates to the fund out of which the remaining debts of the testator ought to be paid. These matters have not been passed upon or considered in the courts below, and we have, therefore, nothing to review in respect to them. Nor are we satisfied that all the facts for a proper judgment upon them are now before us. A final decree in the case should embrace the entire controversy, and we therefore think it inexpedient to pronounce one in this court. Another hearing can be had in the special term of the Supreme Court, when the main questions will be regarded as disposed of by the decision we make, and a final judgment will be rendered upon all the points which may arise. We therefore reverse the judgments of the general and special terms, adopting the conclusions indicated in this opinion. Those conclusions are as follows: (1.) The contingent devise and bequest contained in the seventh article of the will, in favor of the children of the brothers, James and *390 Jeremiah, did not lapse or fail by reason of the death of the son, John Stanton Marshall, without issue, in the lifetime of the testator. (2.) That devise and bequest embrace not' only the real and personal property mentioned in the second article, but also the one-third part of the Walcott mortgage mentioned in the third, of which the income was therein given to the said John Stanton Marshall, during life, and the principal to his issue, if he should have any. (3.) Upon the decease of the testator, the undivided half of the dwelling-house and lot mentioned in the second article, vested, according to the seventh article, in James E. Marshall, the only child of James Marshall, who was not an alien; and the other half did not go into the residuum, but descended equally to the heirs-at-law, James E. Marshall and John W. Downing, all the children of the brother Jeremiah being aliens. In this connection we have considered.thq question whether John W. Downing has any possessory right to the said house under the eighth article of the will, and we think, in accordance with the decision of the' court below, that he has not any such right. (4.) The personal estate mentioned in the second article, and the said one-third of the Walcott mortgage mentioned in the third, on the death of the testator vested, according to said seventh article, in the children of James Marshall and Jeremiah Marshall, then living, that is to say, one-half in each family of children, as a class, such children sharing equally with each other. (5.) The residuary devise and bequest failed as a trust in respect to the real estate therein embraced: that is to say, the title to such real estate did not vest in the executors as trustees. But the trusts attempted to be created are valid as powers in trust, so far as the parties intended to be benefited thereby are competent to take by devise. (6.) The Home Missionary Society, being an unincorporated association, is incompetent to take either real or personal estate, and the residuary clauses of the will, are so far wholly void. (7.) The American Tract Society and the American Bible Society being corporations without power to take real estate by will, the residuary devise is void as to them, so far as it relates to *391 the rents and profits of the land or net annual income to arise from carrying, on the Ida Mills, as the testator directed. (8.) But those societies "will be entitled to share in the proceeds of the sale and conversion of the said mills, and real estate to be ultimately made, as the will directs. The trusts in their favor are also valid as to any personal estate embraced therein. (9.) The Marshall Infirmary is authorized to take by devise, and the trusts to receive and pay over the rents and profits or net annual income to arise as aforesaid, as well as the trust to sell and pay over the proceeds, are so far valid as powers in trust. (10.) All the real estate mentioned in the residuary clauses of the will descended to the testator’s heirs, subject to the trusts declared in said clauses as powers in' trust, so far as the same are now adjudged to be valid. The Marshall Infirmary is entitled to one-half the rents and profits or net annual income from the death of the testator. The other half belongs to his heirs-at-law. Such real estate will be ultimately sold, as the will directs. The Marshall Infirmary will be entitled to one-half the proceeds of such sale. The American Bible and the American Tract Societies will be entitled each to one-sixth, and one-sixth will go to the testator’s heirs.
The judgment must be reversed,' and a new hearing must be had in the Supreme Court, with costs of suit, including this appeal, to abide the final direction of that court.
Denio, J.
It is contended that the direction to sell the residue of the estate and pay the proceeds to the societies is void (except as regards the Marshall Infirmary), on the sole ground that it is forbidden by the statute making void devises to corporations, in these words: “But no devise to a corporation shall be valid, unless such corporation be expressly authorized,” &c. (2 B. S., p. 57, § 3.) I think the statute does not affect the case.
I. According to the earlier part of the opinion of the Chief Judge (in which I concur), it is shown that there is no devise of the land to any one. • There is only a power.- Although we concede that so much of the power as relates to the rents *392 and profits is void, there still remains a distinct authority to sell the land and pay over the proceeds. A power to a trustee (unaccompanied with an estate) to sell lands and pay the proceeds to a given person or institution, is not, in any legal or popular sense, a devise to such person or institution. There is not, therefore, in the case,- any devise tó a corporation, and, for that reason, the statute has no application.
II. If it could be maintained that there was an interest of any kind devised or bequeathed to the corporations, it is not land or real -estate. The direction to sell is a conversion into personal property. I think there is no authority for saying that, under such a direction, the corporations could claim the land.
III. The cases under the statute of 9 George II (ch. 36, §1), commonly, but improperly, called the mortmain act, are not applicable:
1. That statute has not been reenacted in this State. Though adopted in England before the Revolution, and the question as to its incorporation into our system being before the legislature when the general English statutes were reSnacted, it Was not ethbraced among the laws retained. Its special policy was not approved. It may rather be said to have been condemned.-
2. It is not in pari materia with our statute above mentioned, avoiding devises to corporations. The two statutes were not passed in furtherance of the same or a kindred policy, for the apparent motives for the two enactments are quite different. (1.) The English act does not forbid devises to corporations, any more than to natural persons. The provisions are aimed against charities, and not against corporations. Every disposition to a corporation, which would be good if made to a natural person,' is valid, though made to a corporation. (2.) Our act has no reference to charities, but only to corporations;
3. The cases under the act of George II, to which reference is made by the respondent’s counsel, proceed upon the peculiar provisions of that act. It not only makes void the alienation of land for the benefit of charitable uses (to any person), but forbids land from being in any way charged or incumbered. *393 Under such an enactment, it has been very properly held that lands could not be devised to be sold for the benefit of a charity. Such a devise would effectually charge the land, and would be within the express words of the statute. It was remarked by the Lord Chancellor, in The Attorney-General v. Lord Weymouth (Amb., 20), that it was of no consequence, under the mortmain act, whether the gift was of land or money arising out of the sale of land; for, said he, “it is just the same thing—the statute making void all charges and incumbrances on land for the benefit of a charity.”
IV. The distinction between a devise of land and a power to sell for the benefit of another, in respect to the capacity of the donee to take, is well settled by authority. The eases of Craig v. Leslie (3 Wheat., 563), and Ansticc v. Brown (6 Paige, 448), hold that, where land is devised or conveyed to be sold, and the proceeds paid to an alien, the trust is perfectly valid. It is true that, when these cases arose, a devise or conveyance to an. alien was not absolutely void, as devises now are. But I think this makes no difference—the reasoning of the judges in the cases proceeding upon the effect of an equitable conversion, and upon the consideration that the policy of the law which forbids aliens from holding was not infringed upon by-bequeathing money to them to be raised by the sale of land pursuant to a power. So in the present case. The policy and the language of the statute prohibits corporations from holding land by the title of devise; but they are free to take money or personal property by a testamentary gift. To me it seems perfectly consistent with the policy, as it certainly is with the language, of the statute, to hold that a testator may, by will, create a power to dispose of his land and pay the proceeds to a legatee.
I am in favor of a judgment which shall establish the principle I have stated, that is to say, which shall uphold the power as regards the two incorporated societies which are not authorized to take by devise.
Selden, Lott, Jambs, Mason and Hoyt, Js., concurred, except that Lott, Hoyt and James, Js., expressed no opinion *394 upon the question as to the share of the heirs of the testator in the proceeds of the sale of the real estate mentioned in the residuary clause. Davies, J., who'also delivered an elaborate opinion, dissented from the preceding in respect to the validity of the power in trust for the benefit of the charitable corporations, and as to the authority of the Marshall Infirmary to take by devise.
Judgment reversed.